UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                            Case No.: 3:21-cr-93-MMH-PDB

HAROLD CLARE POTTER, III
_____

# SENTENCING MEMORANDUM

The Defendant, **HAROLD CLARE POTTER**, files this sentencing memorandum for the Court's consideration, in support of his request that the Court sentence him to the minimum mandatory term of imprisonment (180 months), followed by a term of supervised release:

## INTRODUCTION

After the sentencing hearing, the Bureau of Prisons will add Mr. Potter to the "Find an Inmate" section of its website, and it will likely read

*Harold Clare Potter, Reg # 67608-509, age 49, release date August 13, 2036.*

Mr. Potter was arrested on August 14th of last year meaning that a 15-year sentence would cause his incarceration until the summer of 2036. Even if you assume that he'll qualify for programming in the Bureau of Prisons and receives 15% for gain time, his release date would be in February 2034.

1

In the First Step Act of 2018, Congress, in addition to changes to the safety valve and other sentencing provisions, created incentives for participating in the evidence-based recidivism reduction programming involving "time credits." These time credits provide that an inmate shall earn additional days of time credits for every 30 days of successful participation in the programming. These time credits reduce the time an inmate must serve in the custody of the BOP.

Unfortunately, Congress provided an extensive list of 'ineligible prisoners.' Mr. Potter will not receive these credits since a conviction under §2252(a)(2) is included in the list of offenses which make an inmate ineligible for the incentives and reduced time.

Here, the minimum mandatory sentence is 180 months' incarceration in the Bureau of Prisons. Mr. Potter asserts that such a sentence is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

## MR. POTTER'S HISTORY AND CHARACTERISTICS

Mr. Harold Potter was born in 1973, in the back seat of a car in Tampa, Florida, to Ms. Pamala Ingram and Harold Potter Senior. His mother, who was only 19 years old, went into labor unexpectedly and rushed to the hospital but delivered before she arrived. This tumultuous entrance to the world was the

2

beginning to a chaotic childhood for Mr. Potter.

Mr. Potter has a series of half-siblings from his mother (an older brother who has passed away) and his father (including two siblings who died from suicide). Matthew Potter committed suicide at the age of twenty- seven on December 11, 2013. Cheryl Potter also committed suicide on August 4, 2004, by hitting a semi-truck head on, she was thirty-four years old. Richard Langham passed away from a chronic health condition on December 6, 2007. Mr. Potter was closest with his brother Richard and when he passed away, it affected Mr. Potter significantly.

Mr. Potter has three living siblings with whom he maintains sporadic contact.

Mr. Potter was raised by his mother for the vast majority of his childhood. However, his mother was often on the move, following after men and jobs. Mr. Potter reported that he attended at least sixteen schools between Florida, Texas, Indiana, and Georgia. Not surprisingly, Mr. Potter did not do well in school after changing schools so frequently. He last attended ninth grade in Duval County. Living in Indiana was the best time in his childhood: He spent an entire year at the same school, played football, ran track, and made friends. However, as soon as the school year ended, his stepfather's job

changed again so the family packed up and moved. Mr. Potter never felt like he fit in at new schools and had difficulty progressing.

After a confrontation with his mother's subsequent significant other, Mr. Potter left his mother's home at about age 17 and started living on his own. Although they have since reconciled, Ms. Ingram notes that she was a terrible mother and regrets the past. Ms. Ingram describes her own chaotic childhood and the upheaval she inflicted on her children through her own drug use and bad choices in men.[1] "I am not proud of who I was and what I put my boys through," writes Ms. Ingram.

Mr. Potter could not turn to his father for stability since his father shared many of the same traits: chasing jobs and relationships. Mr. Potter, Sr. had a total of six children by three different mothers. Mr. Potter reported that his father exposed him to pornography and sexual activity early in his childhood. Research consistently demonstrates that early exposure to deviant sexual behaviors including pornography can cause disordered perceptions about sexuality. Such early exposure also interferes with a child's sexual development and identity.

After moving out on his own, Mr. Potter supported himself by doing

---

1 The family and character letters are attached as Exhibit 1 to this memo.

framing. Through family ties, Mr. Potter got a job doing construction work and started on-the-job training. He became a skilled framer. Also, Mr. Potter learned truck driving and had a commercial driver's license to drive semi-trucks. At other times, he worked at factory jobs in Georgia. Ultimately, Mr. Potter went back to construction and owned his own business doing framing from 2007-2008, and after the housing bust, he began a handyman business from 2012-2015. Mr. Potter returned to truck driving for a few years and then most recently, back to constructions working for Tom Trout, Inc. Tom Trout reported that he was a good employee.[2]

Mr. Potter reported some drug use in his past, including a time of using crystal methamphetamine fairly frequently (for about four months) when working as a truck driver. His other family members convinced him to leave that job and come back to Florida. He stopped using the harder drugs then, although he still used marijuana occasionally. His use of marijuana was more sporadic than it appears in the PSR. It was a social use when he would use with others. Recently, the marijuana use became more medicinal to help him sleep and relax.

---

2 Many of the letters of support talk about his work ethic and trustworthiness in doing the jobs in a competent and professional way.

Mr. Potter reported two suicide attempts (at ages 13 and 19). Because of the age of the records, we could not locate any diagnosis or treatment recommendations from those times. However, Mr. Potter reported a past diagnosis for bipolar depression disorder and paranoid schizophrenia during his 20's. Most recently, his primary care physician diagnosed him with depression and prescribed medications. Mr. Potter is prescribed Lamictal and Effexor for depression and anxiety disorder. Mr. Potter was prescribed the medication about a year before his arrest and has been also taking the medication while detained at the Clay County jail and the Baker County Jail. Mr. Potter reports that the medications are absolutely effective in addressing his depression and anxiety.

Mr. Potter reports that he struggles with the shame caused by his actions in this case and the hurt that he has caused. But he feels relief that everything is over, and everything is out in the open. Even though this brings him embarrassment, he will now be able to get help addressing the underlying issues that brought him to this point.[3]

## NATURE AND CIRCUMSTANCES OF THE OFFENSE

The PSR adequately states the offense conduct involved in this case.

---

[3] Mr. Potter's letter to the Court is attached as Exhibit 2.

Congress obviously viewed this offense as very serious: it calls for a 15-year minimum incarceration sentence and a term of supervised release that could go all the way to lifetime supervision. Given those parameters, Mr. Potter has always recognized that he faced a significant time in custody due to his conduct.

In this case, there is a crime, and it is a serious crime. However, in the scale of crimes which could be charged under this statute, Mr. Potter would ask the court to recognize:   There was no hands-on sexual contact.   Mr. Potter did not distribute any of the images and never had any intention of doing so.

## PURPOSES OF SENTENCING

Federal sentencing law generally asks a court to consider retribution, deterrence, incapacitation, and rehabilitation. Retribution imposes punishment based on moral culpability, whereas deterrence, incapacitation, and rehabilitation are directed towards society's future security.

*1. Reflect Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment*

No one doubts that Mr. Potter committed a serious crime. However, the prosecution by the federal government demonstrates, both to Mr. Potter and to the community-at-large, that these crimes will be dealt with harshly.

Despite the harsh penalty he faced, Mr. Potter entered a plea of guilty to the charge with no pretrial litigation. He has served approximately eleven months in county jails (Clay and Baker) while awaiting the outcome. During time at the county jail, there is almost no programming or educational activities.[4] It is a time of great uncertainty: the only thing that Mr. Potter can be sure of is that he faces a serious sentence.

Mr. Potter has never been sentenced to a prison sentence in the past. Prison is harsh, even without accounting for the type of charged faced by Mr. Potter. Even though prison is obviously meant to be punitive, it often veers far beyond that into cruelty. Any sentence of imprisonment is dangerous. However, an inmate like Mr. Potter (older, having never been to prison, and charged with a sex offense) will be at heightened risk. According to the BOP's website, "The Bureau recognizes sex offenders as a vulnerable population within a prison setting."[5] In spite of this recognition, there are only nine facilities in the entire BOP system offering sex offender treatment programs.[6]

In contrast to the constant danger of prison, there is an unending

---

[4] Baker County Jail records reflect that he has had no disciplinary reports or write-ups.
[5] https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp, last accessed June 21, 2022.
[6] *Id*., FCM Carswell (a women's facility), FMC Devens, FCI Elkton, FCI Englewood, FCI Marianna, USP Marion, FCI Petersburg Medium, FCI Seagoville, and USP Tuscon.

monotony to the time. Every day in BOP custody, Mr. Potter will be under the control of the guards and other authorities at the Bureau of Prisons. He will be assigned to a particular facility by the BOP and told what to wear, where to sleep, when to sleep, when to eat, what to eat, and what type of work to do. If he is given an institution work assignment, like food service, groundskeeper, or laundry, he will earn $.12 to $.40 per hour. He will be given some access to phone contact with the outside world, but all such contact will be closely monitored. He will have no space that is totally his own. For a man who has never been to prison, this is a severe punishment.

2. *Deterrence and Protecting the Public*

Mr. Potter argues that incarceration is not the only way to protect the public. In *United States v. Grossman*, 513 F.3d 592 (6th Cir. 2008), the appellate court noted that protection of the public could still be served by a downward variance. The court opted to pursue the goals of protecting the public and deterring future criminal conduct "through extensive counseling and treatment and an extensive period of supervised release, which itself contains substantial limitations on an individual's freedom." *Id.* at 597 Likewise, a sentence here should require that Mr. Potter comply with counseling, report to the federal supervisor, establish a stable residence, and

9

locate employment.

Custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'") Probationers may not leave the judicial district, move, or change jobs without notifying, and sometimes receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3.

Most probationers are also subject to individual "special conditions" imposed by the court. Here, Mr. Potter will face a series of special and mandated conditions which will severely limit his freedom.

Besides the on-going court review, Mr. Potter will be subject to civil reporting requirements. Mr. Potter must report to the local authorities periodically and update his address. The state authorities maintain a public, searchable database with the offender's name, address, and photograph, and

the database provides general information about the person's conviction. Failure to update such information as required as a separate criminal offense, which can subject a person to additional criminal charges for a failure to register appropriately.

3.  *Needed Educational or Vocational Training*

This directive to the court is difficult to address since it conflicts with the directives given to the Sentencing Commission in 28 U.S.C. §994(k), which states that "The Commission shall insure that the guidelines reflect the general *inappropriateness* of imposing a sentencing to a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment." (Emphasis added).

Although the Court can recommend placement, counseling and educational or vocational programming to the Bureau of Prisons, such recommendations are not binding on the Bureau. However, if the Court orders Mr. Potter to comply with conditions of supervision, the Court, through the United States Probation Officer, can monitor his progress while on supervised release.

## CONCLUSION

*"I HAVE ALWAYS FOUND THAT MERCY BEARS RICHER FRUITS THAN STRICT JUSTICE." ABRAHAM LINCOLN, SPEECH IN WASHINGTON D.C., 1865.*

Here, the court must recognize society's natural repugnance with crimes of this type. However, respect for the law is promoted by punishments that are fair, not those that simply punish for punishment's sake.

For these reasons, Mr. Potter asks that the Court impose a sentence at or near the statutorily required minimum mandatory (180 months), followed by a term of supervised release.

Dated:  July 22, 2022.

A. Fitzgerald Hall, Esq.
Federal Defender, MDFL

s/ *Lisa Call*
Lisa Call, Esq.
Assistant Federal Defender
Fla Bar Number 0896144
200 West Forsyth Street
Suite 1240
Jacksonville FL 32202
Telephone: 904-232-3039
Facsimile: 904-232-1937
Lisa_call@fd.org

12

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been furnished by electronic filing through the United States District Court to Ashley Washington, US Attorney's Office, 300 North Hogan Street, 7th Floor, Jacksonville, FL 32202 on July 22, 2022.

>						s/ *Lisa Call*
>						Lisa Call, Esq.
>						Assistant Federal Defender